Filed 5/31/18

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOSEPH TIERNEY et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>NASIR JAVAID et al.,<br><br>        Defendants and Respondents. | A147221<br><br>(City & County of San Francisco<br>Super. Ct. No. CGC-13-531997) |

This case arises out of a failed real estate purchase by appellant Joseph Tierney from respondents, husband and wife, Nasir Javaid and Dejauna Joseph, the owners of the real property at 376 Castro Street in San Francisco (Property). Tierney contracted with Nasir and Dejauna in 2004 to purchase the Property, where the couple ran a gas station, so he could build a condominium project. As a condition of closing the deal, however, he had to first obtain the necessary "Entitlements" for development from the City and County of San Francisco (City).

The entitlement process was complicated and involved. It ended up taking Tierney eight years—until 2012—to secure the conditional use permit authorizing him to demolish the gas station and construct the residential units. At that point, however, Nasir refused to sell, asserting their deal had expired and Tierney had failed to perform on time.

In 2014, Tierney and 376 Castro Street, LLC (collectively Tierney) sued Nasir, Dejauna, and their business Naz Auto Services (collectively the Naz Parties). Two causes of action were tried to the jury—breach of contract (specific performance) to

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.B, III, and IV.

1

compel sale of the Property and quantum meruit for Tierney to recover costs for work performed at a separate gas station Nasir owned in Mountain View.

On the breach of contact claim, the trial court found the jury hopelessly deadlocked and declared a mistrial. At Tierney's request, the court decided that claim in a statement of decision. It found Tierney failed to perform his contractual obligations and was not entitled to specific performance. But the jury reached a verdict in Tierney's favor on the quantum meruit claim, awarding him $156,000 as the reasonable cost of work he did at Nasir's Mountain View gas station. The court vacated this verdict because Tierney had not produced a certificate of licensure to show his compliance with Business and Professions Code section 7031. The trial court thus entered judgment in favor of the Naz Parties and awarded them attorneys' fees, costs, and other expenses.

We affirm in part and reverse in part. In the published portion of this opinion, we conclude Tierney's election to have the trial court decide his specific performance claim waived any claims of error he had based on the jury trial proceedings leading up to and including the mistrial declaration. We also conclude there was substantial evidence to support the trial court's finding that Tierney failed to perform his part of the contract by not timely paying the purchase price after securing the Entitlements, and thus, he was properly denied specific performance. However, we reverse the trial court's order granting judgment notwithstanding the verdict on Tierney's quantum meruit claim. We also conclude the court erred in awarding the Naz Parties $96,233.12 to in non-statutory costs. In all other respects, we affirm the attorneys' fees and costs award.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Parties and the Property*

In 2004, Nasir and Dejauna bought the Property and gas station for $2.75 million. The following year, Tierney, a general contractor and real estate developer who wanted to build condominiums on the site, offered to purchase the Property.

2

*The Purchase and Sale Agreement*

The parties executed a non-binding letter of intent summarizing the terms and conditions for Tierney's purchase. Their deal was memorialized in a purchase and sale agreement dated August 20, 2004 ("PSA").

The PSA required the purchase price of $3,434,000 be paid to Nasir and Dejauna in two stages. In the "First Closing," Tierney had to pay 10% of the price, or $340,000, by August 23, 2004, for a 10% ownership of the Property as a tenant in common. In the "Second Closing," Tierney had to pay the $3,094,000 balance of the purchase price, to obtain 100% ownership.

Section 5(a) of the PSA set forth two conditions precedent to the second closing. First, Nasir and Dejauna had to satisfy the "ARCO Condition," which required them to secure a quitclaim deed from the Atlantic Richfield Company (ARCO), the gas station's historic supplier, to release any interest ARCO potentially had in the Property. Second, Tierney had to obtain "all permits, approvals and other entitlements required by the [City] with respect to the construction and development of at least [22] residential units," which the PSA defined as the "Entitlements." The Entitlements did not include "ministerial building permits."

If either condition was unfulfilled by August 31, 2005—defined in the PSA as "the Entitlement Deadline"—Tierney could reclaim his initial $340,000 payment (minus $50,000) upon relinquishing his 10% interest in the Property. Alternatively, Tierney could "retain [his] 10% tenancy in common interest in the Property without proceeding to the Second Closing," and Nasir and Dejauna would keep the initial $340,000 payment.

Section 5(b) of the PSA obligated Tierney to "proceed in good faith to attempt to obtain the Entitlements" but did not obligate him "to pay extraordinary application fees or accept any particular restriction on the proposed project." This subsection also made Tierney responsible for clearing the ARCO Condition to the extent Nasir and Dejauna wanted him to help.

3

If the second closing conditions were fulfilled, Section 8(d)[1] of the PSA required Tierney to pay off the balance of the purchase price—$3,094,000—"on or before the date (30) days after both (i) [Tierney] obtained the Entitlements, and (ii) the ARCO condition has been satisfied. . . . Time is of the essence of this deadline." The second closing was "expressly subject to the satisfaction of the conditions set forth in Section 5."

The PSA reflected "the entire agreement between the parties" and could not "be modified in any manner except by an instrument in writing executed by the parties."

### *The Process to Secure Entitlements*

Tierney paid Nasir and Dejauna $340,000 in August 2004 and satisfied the first closing. To secure the Entitlements, Tierney assembled a development team, which included a "permit expediter" to work as a liaison with the City to move the project through the entitlement process, a project designer, and a land use attorney. Tierney's land use attorney described the process for securing a conditional use permit (CUP) from the City as "extraordinarily difficult." The length of a given project's entitlement process varies and cannot be predicted; the process can go anywhere from two years to 10 years. A significant portion of the time is taken up by the City's Planning Department's (Planning) review processes.

The project's entitlement phase began in September 2004 when Tierney submitted an environmental review application to Planning. In August 2005, the project was assigned an environmental planner. In November 2005, Tierney filed the conditional use application for demolition of the gas station and construction of residential units on the Property.

During the entitlement process, the project encountered several difficulties, including two separate lawsuits. In November 2005, Nasir and Dejauna filed a partition action against Tierney alleging Tierney breached the PSA because he had failed to obtain the Entitlements by August 31, 2005. Since Tierney was a 10% owner of the Property,

---

[1] The PSA contained two sections labelled number 8. This refers to the first Section 8, headed "Second Closing."

4

Nasir and Dejauna asked the court to force a sale of the Property and split the proceeds. In December 2005, BP West Coast Products LLC (BP), ARCO's successor-in-interest, sued the Naz Parties and Tierney, seeking to rescind the PSA on the ground that the agreement had violated BP's right of first refusal. In June 2006, both lawsuits were resolved when the parties entered into a "Settlement Agreement, Release and Conditional Covenant Not to Sue" (Settlement Agreement). Nasir and Dejauna agreed to dismiss their partition action without prejudice. Tierney agreed to pay $150,000, to resolve the BP lawsuit and satisfy the ARCO Condition in the PSA.

In September 2006, the project faced another hurdle when Planning incorporated Tierney's project into a "charrette" process instituted by City Supervisor Bevan Dufty, who wanted all new projects in his district to be considered holistically. The charrette was a planning study for Supervisor Dufty's district so that the community's vision could be integrated into the area's development. The charrette took most of 2007 and extended into 2008. It involved multiple community workshops and culminated with the publication of the "Upper Market Development Design Guidelines" in October 2008. The design guidelines, which set forth the community's vision for the area, provided new and additional standards against which Planning would review any proposed project in the area.

In addition, during the charrette, Supervisor Dufty directed Tierney's development team to look for a "community-based organization" as a tenant in response to community requests for "some sort of public benefit use" in buildings. The supervisor provided the team a list of contacts of community organizations for potential building occupants, including the San Francisco AIDS Foundation. By February 2009, Tierney had hired a commercial real estate broker to deal with the Foundation and see if they could occupy the proposed building. Ultimately, no deal was ever reached with the Foundation.

In 2009, Tierney refocused his efforts on the residential plan. In the years that followed, the team worked on implementing the design guidelines from the charrette process, addressing Planning's comments related to the design and conducting neighborhood outreach. In November 2011, Planning published the project's preliminary

negative declaration. In July 2012, Planning approved the project's final mitigated negative declaration, which concluded its environmental analysis.

*Nasir's Mountain View Gas Station*

In May 2012, Nasir and Tierney had further dealings over a shuttered gas station Nasir owned in Mountain View. Nasir needed money to refurbish the Mountain View station to make it fully operational, so he contacted Tierney about leasing the Castro Property. Tierney refused Nasir's request because he thought he would soon obtain the necessary permits and obtain the Entitlements for the project.

However, to address Nasir's need for cash, Tierney offered Nasir $75,000 to refurbish the Mountain View station provided it would be credited towards his purchase price owed on the Castro Property. On May 21, 2012, Nasir emailed Tierney stating that $75,000 was not enough to reopen the Mountain View station. Nasir further wrote that "[t]he original agreement we had is no longer valid since there is no closing date." He also proposed something new: "I can give you another year, but we would have to draft a new agreement with a closing date and if you are not able to close by that date, then you would have to agree to give up your 10% and lose your deposit . . . . I am offering this sale of the business to you for the last time . . . . Sorry, but I have to mitigate my damages and can not wait any longer for you to purchase my property."

To "keep the peace," Tierney went to the Mountain View station to assess what repairs were needed. During this time, Nasir showed Tierney a $30,000 estimate from RC Construction for the bathroom renovation. Tierney said that Nasir "showed [him] the amount of work to be done[,] gave me a set of plans and gave [him] some contracts he had with some people [and he] took it from there." Tierney testified that he remodeled the interior, worked with contractors, and managed the whole project.

In July 2012, during the course of Tierney's work in Mountain View, Tierney notified Nasir that he was paying one of the subcontractors and alerted Nasir that he needed to post a notice for an upcoming Planning hearing on the Property. Nasir responded, "Great, Thanks!!" Tierney testified that based on Nasir's response, he "would then be able to proceed and pay [Nasir] off for the rest of the money [he] owed him."

6

Tierney worked close to a year on the station and emailed Nasir in April 2013 to inform him the work at the station was complete.

There was no written agreement for Tierney's work at the Mountain View station or for the exchanges agreed to by either party. At trial, Tierney testified that he believed whatever work he did on the Mountain View station would be credited to the balance he owed on the Castro Property. Nasir testified that their agreement was that Tierney was going to repair the bathroom for $25,000, and he was "going to have a subcontractor plumber and electrician. That was it." Nasir also testified that Tierney said he would do the work for free, which he found odd, but that he offered to pay. While Nasir stated he was clear to Tierney that the Mountain View work had nothing to do with the Castro Property, he also understood Tierney "just wanted to make sure that [he] was just still going to agree to have the 90 percent still on the market."

Nasir never paid Tierney for any of the work done at Mountain View but at trial said that he had "no problem compensating him . . . whatever Tierney can prove and show" if he ever was provided an invoice of actual amounts worked. Around the time Tierney filed this lawsuit, he sent Nasir an invoice for approximately $237,475. Tierney said he spent approximately $90,000 on out-of-pocket costs for contractors and equipment, and $99,000 in labor costs, which he later reduced to $83,000.

## CUP Approved

On August 2, 2012, the Planning Commission (Planning Commission) held a CUP hearing for the project. The Planning Commission approved the CUP for the demolition of the gas station and the construction of a mixed-use building with 24-residential units. As a condition of approval, the Planning Commission directed Tierney to further work with Planning and neighborhood groups on the building design. The Planning Commission also required that the final approved plans for the building design be presented at a future meeting as "an informational item."

At the Planning Commission's June 6, 2013 meeting, the final building design was presented. At trial, Tierney's project designer stated that the purpose of this was to give more information to the Commission of items that had not yet been completed. Asked

7

whether the project was approved at this hearing, he stated, "This was informational, so it was already approved, from my understanding."

Excluding his $340,000 first closing payment to Nasir and Dejauna and the $150,000 settlement payment to BP, Tierney testified he had spent $350,000 to entitle the Property at the point of securing the CUP.

***Property Advertised for Sale, Followed by this Lawsuit***

Meanwhile, on June 6, 2013, Nasir received an appraisal of the Castro Property valuing it at $4.3 million. He then began to market the Property "so we could avoid this whole litigation," and set the price at $12 million. Tierney "couldn't believe" Nasir was advertising the Property for sale. Tierney's land use attorney testified that Tierney called him and said Nasir was "ignoring the contract and trying to sell the property to someone else, and [he] needed [Tierney's land use attorney] to do something about it."

On June 12, 2013, Tierney's land use attorney wrote Nasir and Dejauna a letter to alert them Tierney wished to close: "We hereby notify you that the Purchaser has received his entitlements for the 376 Castro Street project . . . . [T]he Purchaser hereby demands (1) that you close your business . . . and (2) that the balance of your interest in the Property (90% ownership) be transferred to Purchaser." The letter directed Nasir and Dejauna to deposit a grant deed in escrow and further added, "We understand that you are attempting to market the Property to third parties. Please cease and desist from such efforts." Tierney's attorney notified Nasir and Dejauna that a lis pendens had been recorded against the property to stop any sale and that Tierney filed suit against them to compel completion of the sale under the PSA.

At the time, Tierney had not obtained any demolition or building permit for the project. Nor had he deposited the approximately $3 million balance of the purchase price into any escrow account for Nasir and Dejauna.

***Trial Court Proceedings***

Tierney's complaint alleged the Naz Parties had contractually agreed to sell him the Property, and that he had performed all conditions required of him. Tierney requested the Naz Parties be ordered to convey their 90% interest in the Property to him at the price

set forth in the PSA less applicable credits. Tierney later amended his complaint to add a quantum meruit cause of action for the work he performed on the Mountain View station.

Over the course of three weeks in March 2015, two causes of action for breach of contract and quantum meruit were tried before a jury. Immediately after the parties rested, the Naz Parties moved for a directed verdict on the quantum meruit claim for Tierney's purported failure to show compliance with state contractor's law licensure requirements under Business & Professions Code section 7031. Without ruling on the directed verdict motion, the case was submitted to the jury. After six days of deliberation, the court found the jury hopelessly deadlocked and declared a mistrial on the breach of contract cause of action seeking specific performance. However, the jury was able to reach a verdict in Tierney's favor on the quantum meruit cause of action and awarded him $156,000 as the reasonable value of his services at Nasir's Mountain View station.

On April 9, 2015, Tierney requested that the trial court "having heard all of the evidence and argument in this case" decide on Tierney's specific performance claim in a statement of decision. Proposed statements were submitted by both parties. On August 6, 2015, the trial court filed its statement of decision holding that Tierney was not entitled to specific performance because he failed to perform his obligations under the PSA.

The trial court found Tierney's performance deficient for three reasons: First, the trial court found that the PSA set August 31, 2005, as the "Entitlement Deadline," by which Tierney had to secure the Entitlements, and he failed to meet the deadline. Second, the trial court found Tierney failed to pursue the Entitlements in "good faith" as required by Section 5(b) of the PSA because he spent seven months of the entitlement phase investigating commercial uses for the Property rather than residential units. Third, the trial court found Tierney had obtained the Entitlements on August 2, 2012, when the City authorized the CUP, and that Tierney had failed to pay the balance of the purchase price within 30 days of that date as required by the PSA for the second closing. The record contains no objections from Tierney to the statement of decision.

9

That same day, the trial court also filed a separate order on the quantum meruit claim. The court converted the Naz Parties' section 7031 motion for a directed verdict to a motion for judgment notwithstanding the verdict (JNOV) and vacated the jury's $156,000 award to Tierney.

On October 28, 2015, the trial court entered judgment in favor of the Naz Parties. On December 9, 2015, the court entered an amended judgment which awarded the Naz Parties $830,224.70 in attorneys' fees plus $96,233.12 in "non-statutory expenses."

On December 11, 2015, Tierney appealed both the breach of contract and quantum meruit causes of action.

## DISCUSSION

### I.     Jury Trial Proceedings

Tierney raises a number of issues on appeal with respect to the proceedings in the trial's final days. He contends the trial court improperly undermined the jury's effort to reach a complete verdict by (1) refusing to correct the special verdict form, (2) failing to clarify the jury's confusion about a special instruction, and (3) granting a needless mistrial. He says the court's alleged refusal to help the jury with the special verdict form prevented the jury from completing the verdict and this caused the trial court to improperly declare a mistrial.

The jury was asked to return a special verdict form answering six questions about the breach of contract claim and four related to quantum meruit. On Friday, April 3, 2015, after six days of jury deliberation, the jury informed the court it was able to decide the first three questions but was deadlocked on Question 4, which asked, "Did [Nasir and Dejauna] fail to do something that the contract required them to do?" The trial court suggested that "maybe . . . over the weekend, the lawyers will come up with a different question for you to address."

The following Monday, Tierney moved to submit a substitute special verdict form to the jury. After hearing argument, the court stated it was "not inclined to give [the jury] a modified verdict form because it seems that there are objections that counsel cannot resolve. And the proposed modification, in addition, I think, may cause further

10

confusion." The court directed counsel to meet and confer again to attempt to resolve the issue. However, counsel could not reach agreement on any change to the special verdict, and the trial court maintained its view that the proposed change would likely not resolve the jury's confusion. After some additional argument, the court directed counsel to meet and confer again. Again, they could not reach agreement. The court told the jury "there is no further instruction that I can provide you specifically . . . at this time." The court found the jury hopelessly deadlocked and declared a mistrial on the contract cause of action. Later that week, Tierney requested that the trial court "having heard all of the evidence and argument in this case" decide specific performance in a statement of decision. The statement of decision which followed noted that "both parties requested that rather than re-set the case for jury trial, the Court issue a ruling as to whether Mr. Tierney is entitled to specific performance."

As a threshold matter, the Naz Parties argue that matters relating to the jury trial proceedings are not properly before the court because they relate to a non-appealable declaration of mistrial. We disagree. The Naz Parties are correct that a declaration of a mistrial is a non-appealable order (*Warner v. O'Connor* (1962) 199 Cal.App.2d 770, 773), but Tierney's appeal is not from the court's decision to grant a mistrial. Tierney's notice of appeal makes clear he appeals from the court judgment. Under Code of Civil Procedure section 906, an appeal from a judgment allows an appellant to challenge all trial court actions that led to the judgment. (See Code Civ. Proc. § 906.) Tierney's claims of error with respect to the declaration of mistrial are appealable.

Even so, the Naz Parties contend Tierney waived his right to complain about what happened in the trial's final days. They contend Tierney's decision to ask the trial court to decide the specific performance claim rather than ask to reset the case or move for a new jury trial waives Tierney's arguments related to any errors in the late stages of trial. The cases they cite as authority, including *Escamilla v. California Insurance Guarantee Association* (1983) 150 Cal.App.3d 53, concern whether parties waived their right to a jury trial, not whether they waived their right to appeal errors that occurred before they requested the court to decide a controversy, which is the particular issue here. Factually,

11

we agree with Tierney that "[t]his situation is very unusual." Like Tierney, "[w]e have found no reported California case where something similar has happened."[2] Nonetheless, based on the circumstances, including Tierney's request that the trial court decide his specific performance claim, we are persuaded that Tierney waived his right to assert alleged errors that may have occurred during jury deliberations.

Tierney's appeal about the jury trial is driven by his claim that "his victory [was] swept away" because he was on his way to a "pending favorable verdict." But reversing and setting aside the trial court's statement of decision, as Tierney urges, would not restore or somehow reconstitute the original jury or restore its favorable responses to any of the special verdict inquiries, all of which were nullified once the trial court declared a mistrial. (See *In re Bartholomae's Estate* (1968) 261 Cal.App.2d 839, 842 ["A mistrial is equivalent to no trial; it is a nugatory trial."]; Wegner et al., Cal. Practice Guide: Civil Trials & Evidence (The Rutter Group 2011) ¶ 12:2, p. 12–1 ("A mistrial *terminates* the trial midproceedings for error . . that has prejudiced a party's right to a fair trial and that cannot otherwise be remedied. No matter how far the trial has progressed, a mistrial means the case must be retried from the beginning.")].)

Reversal here would only secure for Tierney the right to impanel another jury. But he received an equivalent remedy from the trial court. In his "Request for Statement of Decision," filed April 9, 2015, Tierney wrote, "Plaintiffs hereby request that the Court prepare a Statement of Decision supporting its decision on Plaintiffs' First Cause of Action for Breach of Contract-Specific Performance." The court's statement of decision served as the remedy for whatever errors may have occurred in the jury trial's final days. Such claims of error "did not affect[] the legitimacy of the statement of decision," as Tierney asserts. On this record, Tierney's belief that he would have received a more favorable outcome had the original jury completed the special verdict form with more

---

[2] The Naz Parties point to *Plumley v. Mockett* (2008) 164 Cal.App.4th 1031, as "a virtually identical case." The proceedings in the state court action described in *Plumley* share similarities to this case (*id.* at pp. 1037-1038), but the legal issues and analysis are completely distinct.

intervention from the trial court is no more than speculation. It does not give us reason to invalidate the trial court's decision, since a litigant is not entitled to a rotation of juries and jurists until he achieves the outcome he desires.

Observing that a waiver is the intentional relinquishment of rights, Tierney argues that "there is no evidence [he] intended to relinquish his right to a completed verdict from the jury. In fact, he vigorously protested the mistrial declaration." He contends that it was "[o]nly after losing that argument did he consent to a *court* trial, which he did because he sought an equitable remedy—specific performance—which only the court *may* grant." We agree that Tierney urged the court to modify the special verdict form and supplement its instructions before the court declared a mistrial, but we disagree there was no evidence of his intent to waive his right to a complete jury verdict. He requested the court prepare a statement of decision. Just because Tierney's request came after the mistrial does not excuse him. Even then, Tierney could have asked the case be reset for a jury trial rather than proceed with a decision from the bench. Tierney's election to proceed with a statement of decision from the court reflected his decision to forego a retrial before a new jury.

Tierney further explains that he did not seek another trial on money damages before a new jury because he had already "endured the financial and emotional cost of a two-week jury trial." Tierney argues these circumstances were coercivce. We disagree. Given the stakes and the Property's potential value, another developer may have chosen differently. The financial and emotional costs of litigation are no doubt significant, but they did not prevent Tierney from exercising his right to retry his case before a new jury and possibly secure the special verdicts he sought.

Finally, Tierney argues that accepting the Naz Parties' waiver argument would "leave the litigant faced with an erroneous mistrial with no practical remedy." Not so. Tierney could have retried the case. If a retrial was not practical, there are instances where litigants have petitioned for writ of mandamus requesting that a trial court vacate

13

an order declaring mistrial.  (See, e.g., *Heavy Duty Truck Leasing, Inc. v. Sup. Ct.* (1970) 11 Cal.App.3d 116, 119.)[3]

In light of our conclusion that Tierney waived his claims of error arising in the jury trial, we need not review Tierney's specific arguments with respect to those claimed errors and will proceed to consider his challenges to the trial court's statement of decision.

## II.     Specific Performance

*A.  Impact of Jury's Partial Verdict on Trial Court's Statement of Decision*

Tierney first contends that the "jury's findings would have bound the court when it ruled on specific performance.  So bound, the court could not have ruled as it did in its Statement of Decision."  We disagree.

*Falls v. Superior Court* (1987) 194 Cal.App.3d 851 (*Falls*) is instructive.  There, the special verdict form given to the jury required findings on five questions: negligence, proximate cause, damages, the plaintiff's comparative negligence, and percentage of fault.  (*Id.* at p. 853.)  The jury answered the first two questions in the plaintiff's favor but could not agree on damages and did not answer the last two questions.  (*Id.* at p. 854.)  The trial court declared a mistrial, and denied the plaintiff's motion for an order adjudicating liability in his favor.  (*Ibid.*)  The plaintiff unsuccessfully sought a writ of mandate to compel the court to enter a partial verdict on liability and proximate cause.  (*Ibid.*)  The appellate court affirmed, explaining that a special verdict requires a jury to resolve all of the ultimate facts presented to it so that nothing remains for the court but to draw conclusions of law.  (*Id.* at pp. 854–855.)  Because the jury decided only two of the

---

[3] Tierney also cites *American Modern Home Ins. Co. v. Fahmian* (2011) 194 Cal.App.4th 162, 170, and *Amerigraphics, Inc. v. Mercury Casualty Co.* (2010) 182 Cal.App.4th 1538, disapproved of on other grounds by *Nickerson v. Stonebridge Life Ins.* (2016) 63 Cal.4th 363, for the proposition that a party's objection in the trial court to a special verdict form, even during post-trial briefing, allows the party to challenge the question on appeal.  That is true, but neither of those cases involved a jury deadlock on the special verdict with a resulting mistrial and decision by the court.  Our waiver decision is based on Tierney's election to proceed with a decision by the court, not on his failure to make his objections known.

14

five "ultimate facts," the court was unable to draw any conclusion on liability. (*Id.* at p. 856.) The court further reasoned that awarding the plaintiff a partial verdict under the circumstances "would also severely prejudice defendant at the time of retrial, since the jury would be instructed that defendant's negligence was a fait accompli." (*Ibid.*)

Here, the same concerns about prejudice following the declaration of a mistrial apply. Disregarding the jury's incomplete special verdict ensured that specific performance did not become a fait accompli upon the trial judge's consideration of the merits. Unconstrained by the jury's incomplete special verdict, the trial court properly made its own independent findings of fact.

Tierney attempts to distinguish *Falls* on the basis that the jury's failure to reach a verdict in *Falls* was not due to the trial court's failure to assist the jury as here and this difference should lead to a different conclusion. We do not accept Tierney's characterization of the trial court's efforts, or his basis for distinguishing *Falls*. Special verdicts come with "recognized pitfalls," namely, they require the jury to resolve all of the controverted issues in a case, unlike a general verdict which merely implies findings on all issues in one party's favor. (*Falls*, *supra*, 194 Cal.App.3d at p. 855, *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 678 [" ' " '[T]he possibility of a defective or incomplete special verdict, or possibly no verdict at all, is much greater than with a general verdict that is tested by special findings.' " ' "]) Just as in *Falls*, once the mistrial was declared in this case, the trial court properly ensured that the proceedings were not prejudiced by the inconclusive verdict. Denying the incomplete special verdict findings a fait accompli status accomplished this objective.

*Hoopes v. Dolan* (2008) 168 Cal.App.4th 146 (*Hoopes*), which Tierney relies on, is not determinative. *Hoopes* involved legal and equitable claims and defenses between two commercial tenants claiming exclusive rights to the same parking spaces. (*Id.* at pp. 151–153.) In a special verdict, the jury "expressly found" the plaintiff had the right to exclude the defendants and their customers from the parking spaces. (*Id.* at pp. 150, 154, 158.) Later, the trial court "rejected the jury's factual findings and made its own independent evaluation of the evidence," and "found, contrary to the jury's

15

special verdict, that" the plaintiff did not have the right to exclude defendants and their customers from the parking spaces. (*Id.* at pp. 154–155.) The appellate court held that the "trial court erred in disregarding the jury's verdict when ruling on equitable remedies that relied on common issues of fact previously adjudicated by the jury." (*Id.* at p. 158, italics omitted.) Unlike here, the *Hoopes* jury returned a special verdict (*id.* at p. 154), so *Hoopes* never addressed the consequences of an incomplete special verdict on fact finding in proceedings following the declaration of a mistrial. It does not apply.

### B. Merits of Statement of Decision

We now address the merits of the trial court's decision in light of our conclusion that the trial court was not constrained by the partial verdict.

" 'In general, in reviewing a judgment based upon a statement of decision following a bench trial, "any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision. [Citations.]" [Citation.] In a substantial evidence challenge to a judgment, the appellate court will "consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]" [Citation.]' " (*Cuiellette v. City of Los Angeles* (2011) 194 Cal.App.4th 757, 765.) However, where the material facts are not in dispute and the parties present the appellate court with questions of law, such questions are reviewed de novo. (*Ibid.*)

As the trial court pointed out, the following elements are required to prevail in a claim for specific performance: "(1) a contract sufficiently definite and certain in its terms to be enforced [citations]; (2) that the contract was just and reasonable [citations]; (3) that the plaintiff has performed his side of the bargain [citations]; (4) that the promisor has failed to perform [citations]; and (5) that the contract was supported by adequate consideration." (*Porporato v. Devincenzi* (1968) 261 Cal.App.2d 670, 674.)

Tierney's appeal focuses exclusively on the third element—his performance of his side of the bargain—and he claims "several legal errors" in the trial court's decision. First, Tierney contends the finding that August 31, 2005, was the entitlement deadline

16

was wrong and misconstrued the PSA. Second, he contends the trial court incorrectly concluded that his exploration of possible commercial use of the Property failed to satisfy the PSA's requirement that he pursue the Entitlements in "good faith." Third, he contends he did not breach the PSA for his failure to make the final payment within 30 days of obtaining the Entitlements. He argues the court incorrectly found the Entitlements issued on August 2, 2012, and triggered the 30-day period within which he had to pay the outstanding $3 million balance owed on the purchase price.

We need not address all of Tierney's claims of error. Even assuming arguendo that Tierney could prevail on his contentions with respect to the entitlement deadline and the PSA's "good faith" requirement, we conclude that his claim regarding his compliance with the 30-day payment deadline is without merit and that substantial evidence supported the trial court's finding that he failed to timely make the payment needed for the second closing.

In order to close on the sale of the Property, Section 8 of the PSA obligated Tierney to pay the outstanding balance of the purchase price "on or before the date thirty (30) days after both (i) Purchaser has obtained the Entitlements, and (ii) the ARCO Condition has been satisfied (the "Second Closing Date"). Time is of the essence of this deadline."

There is no disagreement that the ARCO Condition was satisfied in June 2006 by way of the Settlement Agreement under which Tierney paid BP $150,000. The disputed issue is whether the Entitlements were obtained and if so, when. There was substantial evidence to support the trial court's finding that Tierney obtained the Entitlements on August 2, 2012, and that Tierney failed to pay the purchase price balance within the next 30 days, or by September 2, 2012.

First, as the trial court explained, several witnesses, including Tierney's affiliates, testified that the term "Entitlements" is used interchangeably with the term "conditional use" in the San Francisco real estate development industry. Where technical words are used in a contract, the parties are assumed to have intended those words to have the

17

meaning usually given to them by people who work in the technical field.  (*Cooper Companies, Inc. v. Transcontinental Insurance Co.* (1995) 31 Cal.App.4th 1094, 1101.)

At its August 2, 2012 hearing, the Planning Commission approved Tierney's CUP. The significance of the event was not lost on Tierney and others affiliated with the project.  On February 23, 2013, Tierney wrote to a prospective lender that he "applied for planning permission in [']05 and last August received entitlements."  In May 2013, Tierney signed a letter of intent with a prospective business partner, Sean Sullivan, which described the Property as "a gas station with entitlements from [Planning]."  Testifying about the letter of intent, Sullivan stated, "It was my understanding, based on the documents that I reviewed, that the entitlements were in hand, yes."  When asked whether Tierney had told him that the project had received its entitlements, Sullivan responded, "Him and [his land use attorney] did, yes."  Further, Tierney's attorney represented to Nasir and Dejauna in his June 12, 2013 letter that the Entitlements had been secured: "We hereby notify you that the Purchaser has received his Entitlements for the 376 Castro Street project."  His claim to having the Entitlements was used as the basis to compel Nasir and Dejauna to shutter their gas station business, remove their belongings, and transfer the Property to Tierney.  At trial, Tierney's land use attorney explained:

"Q:  What did you mean when you used the word 'Entitlements'?

A:  Oh, actually, I did.  In the next sentence, I referred to the PSA.  "Entitlements" means conditional use, entitlements to build the building.

Q:  When you wrote this letter, did you look back at the definition of "Entitlements" in the purchase and sale agreement?

A:  Yes.  I know I did because I referenced that section here, the Sections 2(c) and 8(d) of the purchase and sale agreement.  I wanted to see exactly what the agreement said.  And I knew that Mr. Tierney was required to notify the seller when he obtained his permits."

These documents and testimony provide substantial evidence for the trial court's finding that the "Entitlements" issued on August 2, 2012, which made Tierney's deadline

18

to pay the $3 million balance and complete the second closing no later than September 2, 2012. Since it was undisputed that Tierney never tendered this balance, Tierney failed to perform under the PSA, and he had no grounds to compel the Naz Parties to complete the sale.

None of Tierney's arguments warrant a different conclusion. Tierney claims the August 2, 2012 approval was not final because the Planning Commission required him to satisfy certain design issues with the community. He argues the design review condition was not satisfied until the follow-up CUP hearing took place on June 6, 2013. This argument is easy to reject. The Planning Commission's documents from the August 2, 2012 hearing make clear that it approved the CUP that day. The materials for the Planning Commission's June 6, 2013 hearing reflect that the project was "an informational item to present the design of the building to the Planning Commission" but otherwise "[n]o action [was] necessary." Tierney's own designer at the June 6, 2013, hearing underscored this. Asked if the project was finally approved at the June 6, 2013 hearing, Tierney's designer testified, "This was informational, so it was already approved, from my understanding." He explained that the project team was just giving more information to Planning regarding some items that had yet to be completed. Once the Planning Commission approved the CUP on August 2, 2012, nothing further was required.

Tierney also argues that he still had to secure discretionary, demolition and building permits before the 30-day payment obligation was triggered, and that these permits did not fall under the exception for "ministerial permits" in the PSA. The Naz Parties' entitlement expert testified that such permits are ministerial because they are based on a set of prescriptive rules in the Building Code. This was sufficient support for the trial court's rejection of the same argument. Even if not sufficient, Tierney's argument is not persuasive given his multiple representations in 2013 to prospective investors and to Nasir and Dejauna that he had the Entitlements to close the deal, notwithstanding the fact that the demolition and building permits had not issued. In light of those representations signifying the parties' understanding of "Entitlements" in the

19

PSA, we need not address the cases Tierney relies upon on appeal regarding general discretion over particular permit applications.

Tierney further contends that Nasir repudiated the PSA even before the CUP approval when in in May 2012, he emailed Tierney that their original agreement was "dead." Tierney contends this repudiation relieved him of his duty to pay the balance of the purchase price. This is no excuse either. There is no evidence that Tierney treated Nasir's May 2012 email as an anticipatory breach. Tierney's response to the May 2012 email was to offer $75,000 towards the renovation of the Mountain View gas station and to spend nearly a year of his own time working on the repairs. During this time, he believed he was still able to "pay [Nasir] off for the rest of the money [he] owed him" to complete the purchase. Also, Tierney did not sue following the May 2012 email. Nasir's decision to advertise the Property for sale in June 2013 prompted Tierney's legal action. Substantial evidence shows that Tierney did not treat Nasir's May 2012 email as a repudiation of the parties' agreement. Thus, it did not excuse Tierney's failure to pay the purchase price by September 2, 2012.

Lastly, in his reply brief, Tierney raises the Restatement of Contracts Second, section 251(1), which provides that a "repudiation may occur when a party, acting on the reasonable belief that the other party intends to breach the contract, requests a reassurance of performance and receives none within a reasonable time." Tierney contends he was allowed to "suspend his duty to pay the [contract balance] into escrow until he was assured that [the Naz Parties] would satisfy their duty to put a deed into escrow." This is a new argument raised for the first time on appeal in Tierney's reply brief, so we decline to address it. (*Allen v. City of Sacramento* (2015) 234 Cal.4th 41, 52 [arguments raised for the first time in appellate reply brief ordinarily forfeited]).

Tierney's failure to tender the purchase price balance by September 2, 2012—within 30 days of receiving the Entitlements—is enough for us to affirm the trial court's judgment on the specific performance claim.

20

## III.    Quantum Meruit

Tierney argues the trial court erroneously granted the Naz Parties' JNOV on his quantum meruit claim and should not have overruled the jury's $156,000 verdict for his uncompensated work on Nasir's Mountain View gas station.  We agree.

"When reviewing an order granting a judgment notwithstanding the verdict our role is not to weigh the evidence, but rather to determine whether any substantial evidence supported the jury verdict." (Bengal v. Canfield Associates, Inc. (2000) 78 Cal.App.4th 66, 77.)  "[W]e ' "must resolve any conflict in the evidence and draw all reasonable inferences therefrom in favor of the jury's verdict." ' " (*Hansen v. Sunnyside Products, Inc.* (1997) 55 Cal.App.4th 1497, 1510.)  If, however, the issues on appeal deal solely with statutory interpretation and application of a statute to undisputed facts, "[r]eview of such issues takes place de novo." (*Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284.)

The statute at issue here is Business and Professions Code, section 7031 (section 7031), which bars unlicensed contractors from maintaining any claim for compensation for work performed.  (See generally Bus. & Prof. Code, § 7031.)  The operative provision, subdivision (d), provides, "If licensure or proper licensure is controverted, then proof of licensure pursuant to this section shall be made by production of a verified certificate of licensure from the Contractors' State License Board which establishes that the individual or entity bringing the action was duly licensed in the proper classification of contractors at all times during the performance of any act or contract covered by the action . . . .  When licensure or proper licensure is controverted, the burden of proof to establish licensure or proper licensure shall be on the licensee." (Bus. & Prof. Code, § 7031, subd. (d).)

Here, Tierney's operative complaint alleged he "[was] licensed by the State's Contracting Licensing Board to provide construction services."  The Naz Parties generally denied this allegation in their answer.

But the Naz Parties also cross-claimed against Tierney, alleging "the scope of work purportedly completed by Tierney . . . exceeds the scope of his California

21

Contractor license, and as such the work performed was illegal." Their cross-claim further alleged, "Tierney warranted that he was a licensed general contractor who was capable of performing . . . . However, on information and belief, Tierney performed work he was not licensed to perform and therefore breached the implied warranty." There was also a declaratory relief cause of action under section 7031, raising similar allegations and asking that Tierney "take nothing from his quantum meruit cause of action."

At trial, on direct examination, when asked if he has any professional licenses, Tierney responded that he was "a building contractor in California; California's contractor's license," which he estimated he had held since the early 1990s. During his cross-examination, Tierney had this exchange with opposing counsel regarding his Mountain View gas station work:

"A: Now, I was working everywhere, inside and outside, but I wasn't responsible for the light posts. And I wasn't the listed general contractor on the job.

Q: That's a good point. I want to talk about your contractor's status. You're not licensed by the State of California to do this type of work, are you?

A: To manage a building?

Q: Yes.

A: I'm sure I can manage a project. Project manager, I'm sure.

Q: To manage, for example, the installation of, you know, gas lines and all the emissions controls and everything that goes along with it? Do you have that license?

A: Waltons [the fueling system engineers] were self-sufficient. They managed themselves. I didn't have to get involved with the Waltons.

Q: How about Shield Harper, did you supervise Sheild Harper?

A: Shield Harper, Naz got the Shield Harper. They were suppliers of equipment. . . ."

Tierney's construction expert was also asked about Tierney's license during his cross-examination by opposing counsel:

"Q: Do you know whether Mr. Tierney has an A license or B license?

A: I do not.

Q: Is it possible that the work Mr. Tierney alleges he performed in Mountain View—the re-opening of a gas station, installing gas tanks, et cetera—is it possible that that's beyond the scope of Tierney's contractor's license, not knowing whether he has an A or B license?

A: Well—

Q: Is it possible?

A: Is it possible? I don't think so, no."

On this record, we conclude Tierney's licensure was not controverted. The Naz Parties concede they did not challenge whether Tierney "has *a* license." They acknowledge that if section 7031, subdivision (d) "turned only on the existence *vel non* of a contractor's license, [Tierney] would prevail." Instead, the Naz Parties contend they controverted whether Tierney "had the *proper* license" to do the work he claims to have done. Tierney prevails on this issue.

*Womack v. Lovell* (2015) 237 Cal.App.4th 772, 780 (*Womack*), a case decided after the trial court took the Naz Parties' converted JNOV motion under submission, is instructive. There, Womack, a homeowner, sued Aztec, his home remodel contractor, for breach of contract. (*Id.* at p. 776.) Womack's first amended complaint alleged twice that Aztec " 'at all times' relevant to the suit, 'acted in the capacity as a licensed contractor.' " (*Id.* at p. 776.) Later, in response to a cross-complaint filed by Aztec, Womack generally denied all of Aztec's allegations, including an allegation that Aztec had been a licensed general contractor at all relevant times. (*Id.* at p. 777.) Notwithstanding Womack's general denial, the court found that "there was no need on Aztec's part to present a verified certificate from the License Board as part of its case." (*Id.* at p. 786.) Because Womack had alleged twice in his pleading that Aztec had acted in the capacity of a

23

licensed contractor at all times relevant to the suit, the court reasoned that Womack had "effectively told both the court and [the contractor]—twice—that the issue of [the contractor's] licensure was uncontroverted for purposes of section 7031, subdivision (d)." (*Ibid.*)  Further, the trial court found that Womack had failed to identify the controversy around Aztec's licensure and was thus out of compliance with local rules requiring specification of all controverted issues prior to trial, which did not allow for "silent gamesmanship." (*Id.* at pp. 788-789.)  Womack's judicial admission compounded by his failure to identify licensure as a controverted issue "rendered the question of licensure assuredly uncontroverted for purposes of section 7031." (*Id.* at p. 776, italics omitted.)

Like Womack, the Naz Parties also effectively communicated to the trial court and Tierney that Tierney's proper licensure was not controverted for purposes of section 7031.  As the trial court observed, only Tierney's claims for breach of contract and claim for quantum meruit were tried to the jury.  With respect to the quantum meruit claim, the Naz Parties trial brief said this in total: "This case also includes a pendent claim by Mr. Tierney for quantum meruit for work he claims to have performed at a Mountain View gas station owned by [Nasir and Dejuana].  While Defendants agree that Mr. Tierney did some construction work on the Mountain View property, Defendants themselves paid most of the vendors and subcontractors, and Mr. Tierney has never provided Defendants with an itemized statement of what he claims they own him.  Instead—after this litigation began—Mr. Tierney sent Defendants a one-page invoice for $237,000 that is the equivalent of a 'Services Rendered' bill.  [Citation.]  Defendants have offered to pay Mr. Tierney for the work he did that he can document, but he refuses to provide any documentation."  No mention is made of their section 7031 defense that Tierney lacked a proper license in their trial brief.  At trial, beyond vague suggestions, the Naz Parties presented no affirmative evidence regarding the specialty license Tierney purportedly needed to perform his work at Mountain View, or that Tierney even performed work requiring a specialty license.  They called no contracting expert to bolster their section 7031 defense, and never even argued the defense in their closing argument.  The controversy was not reasonably cognizable until the Naz Parties moved for a directed

24

verdict on the quantum meruit claim immediately after the close of evidence. Since his proper licensure was not controverted before the close of evidence, Tierney had no notice or obligation under section 7031, subdivision (d) to present a verified certificate from the License Board as part of his case.

Citing their general denial, cross-complaint, and cross-examination of Tierney and his construction expert, the Naz Parties contend proper licensure was "plainly controverted" at every stage of the proceeding. Not so.

The Naz Parties' general denial was directed at Tierney's allegation that he "[was] licensed by the State's Contracting Licensing Board to provide construction services." Since Tierney's operative complaint did not allege he was licensed for specialty work, the Naz Parties' general denial did not controvert the issue of *proper* licensure. Besides, as noted above, the Naz Parties concede they do not challenge where whether Tierney has a license.

The Naz Parties' cross-examinations at trial also did not controvert Tierney's *proper* licensure. As an initial matter, merely posing questions on a topic does not controvert an issue. Asking Tierney "[y]ou're not licensed by the State of California to do this type of work, are you?" was nothing more than a vague inquiry inadequate to put the issue in dispute. Moreover, none of Tierney's responses generated a dispute. When asked specific questions about his work in Mountain View, Tierney's responses that he neither supervised or managed the fueling-system-related vendors underscored the absence of a dispute on the issue of whether he was doing work outside of his license. The questions to Tierney's construction expert were even less consequential, since the expert fully refuted the notion that Tierney conducted work outside his license, and he had no knowledge of Tierney's license classification.

The Naz Parties' cross-complaint is admittedly their strongest testament to a controversy on the issue of proper licensure, but it too falls short. Based on our review of the record, the Naz Parties did not litigate the claims in their cross-complaint, including their declaratory relief claim under section 7031. As noted earlier, the trial only concerned Tierney's breach of contract and specific performance claim. None of the

25

claims in the Naz Parties' cross-complaint were part of the trial. On this record, we cannot conclude Tierney's proper licensure was "plainly controverted" at every stage of the proceedings.

The Naz Parties duly note that they "were not obligated to make sure that both sides put on their best case, nor to explain in advance the requirements of section 7031." The general premise is accurate as far as it goes. But section 7031 did obligate them to sufficiently controvert the scope of Tierney's licensure. Here, where Tierney's general contractor's license was undisputed, the Naz Parties' vague intimations that Tierney performed work beyond the scope of that license was insufficient to meet the statutory requirement. In these circumstances, involving a duly licensed general contractor, more than unsubstantiated assertions were required from the Naz Parties to controvert the issue of proper licensure so Tierney could respond in kind by showing he was duly licensed in the proper classifications of contractor being challenged. On this record, there was no evidentiary basis for the Naz Parties' proper licensure challenge, nor was there a way for Tierney or the court to have reasonably known the scope of Tierney's license was a controverted issue through trial until the Naz Parties' counsel moved for a directed verdict after the close of evidence. Even at that point, given the dearth of evidence that Tierney did work beyond his general contractor's license, Tierney would not have reasonably known what type of verified certificate was required to establish proper licensure.

We recognize the strong public policy behind section 7031 "which favors protecting the public from unscrupulous and incompetent contractors" and which recognizes that the statute " ' " 'represents a legislative determination that the importance of deterring unlicensed persons from engaging in the contracting business outweighs any harshness between the parties . . . .' " ' " (*WSS Indus. Constr., Inc. v. Great West Contractors, Inc.* (2008) 162 Cal.App.4th 581, 587, italics omitted.) Under the facts of this case, however, that public policy is not served by vacating the jury verdict awarded Tierney, an undisputed California-licensed contractor, for work he performed and for which the Naz Parties acknowledge they never paid. Here, if Tierney had produced a

26

certificate showing he is a licensed general contractor, more would be required to show he was doing work beyond the scope of his license. This was not a situation involving an unlicensed person unscrupulously engaging in the contracting business, which the statute understandably and forcefully condemns.

## IV.    Attorneys' Fees, Costs, and Non-Statutory Expenses

Finally, Tierney contends the fee and cost award of $991,365.89 should be reversed if the judgment is reversed for any reason regarding the PSA. Even if the underlying judgment is affirmed, he argues that $96,233.12 awarded in "non-statutory" expenses was improperly included. Because we only reverse the trial court's order granting judgment notwithstanding the verdict on the quantum meruit claim and do not reverse the judgment on the breach of contract claim, we focus only on the contested $96,233.12 award. We review the trial court's attorneys' fees decision for abuse of discretion. (*Dzwonkowski v. Spinella* (2011) 200 Cal.App.4th 930, 934; *El Dorado Meat Co. v. Yosemite Meat & Locker Services, Inc.* (2007) 150 Cal.App.4th 612, 617.).

The 2006 Settlement Agreement contained a cost-shifting provision. For any lawsuits relating to the Settlement Agreement, "the losing party shall pay the prevailing party's reasonable attorneys' fees as may be determined by the court, as well as costs, expert witness fees and other expenses incurred in preparation for and conduct of that action or proceeding, appeal of judgment, and enforcement and collection of judgment or award."[4]

Under that provision, the Naz Parties sought to recover $96,233.12 in non-statutory expenses over and above the $64,908.07 they recovered in statutory costs and

---

[4] The parties' PSA also included a cost-shifting provision for attorneys' fees and other costs, which stated, "If litigation is commenced between the parties, the prevailing party in that litigation shall be entitled to recover from the nonprevailing party all reasonable attorneys' fees and costs. The prevailing party shall also be entitled to all costs and expenses incurred in connection with executing upon or appealing any judgment." Because the Settlement Agreement superseded the PSA, we focus on the cost-shifting provisions in that later agreement.

27

$830,224 they recovered in attorneys' fees. These non-statutory expenses included expert witness fees, mock trial and jury consultants, and photo copy expenses. The trial court concluded that the Settlement Agreement allowed the Naz Parties to recover the approximately $96,000 for "expert witness fees" and "other expenses incurred in preparation for and conduct of [the] action or proceeding." In doing so, it abused its discretion.

Code of Civil Procedure section 1033.5 precludes recovery of the non-statutory expenses awarded the Naz Parties "except when expressly authorized by law."[5] While the case law is not uniform on this issue, the parties can "freely choos[e] a broader standard authorizing recovery of reasonable litigation charges and expenses." (*Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 492.) That is what the parties did here, and the trial court's order endorsed that approach, allowing the Naz Parties to recover non-statutory costs based on the Settlement Agreement's cost-shifting provision. Even without deciding whether these costs fall within the exception, the non-statutory award is not supportable.

The Naz Parties cannot recover their non-statutory expenses because they never specially plead or proved them prior to judgment. "Special contract damages are subject to pleading and proof in the main action and cannot be recovered by mere inclusion in a memorandum of costs. [Citations.] [¶] . . . [¶] [T]he issue must be submitted to the trier of fact for resolution pursuant to a prejudgment evidentiary proceeding, not a summary postjudgment motion." (*First Nationwide Bank v. Mountain Cascade, Inc.* (2000) 77 Cal.App.4th 871, 877, 879 (*First Nationwide*).) Prior to judgment, there was no special allegation as to these costs in the Naz Parties' answer. "Costs of suit" and "reasonable attorneys' fees" were requested, but no mention is made of expert witness fees or other

---

[5] Unless the exception applies, the following items are not allowable as costs: "(1) Fees of experts not ordered by the court[;] (2) Investigation expenses in preparing the case for trial[;] (3) Postage, telephone, and photocopying charges, except for exhibits[;] (4) Costs in investigation of jurors or in preparation for voir dire." (Code Civ. Proc. § 1033.5.)

costs. During the trial, the Naz Parties never sought to prove these costs either. They do not point us to anywhere in the record where they provided evidence of costs and fees during trial, or any witness examination about the cost-shifting provisions for non-statutory costs. Closing argument made no reference to the expert fees issue or other costs. Having failed to plead and prove these non-statutory items before judgment, they may not recover them.

The Naz Parties acknowledge the pleading and proof requirement "might be true in some cases" but argue that the applicable agreement here (the Settlement Agreement) provided that such fees and expenses were recoverable "as may be determined by the court." The trial court interpreted that provision to mean that it was up to the court to adjudicate the reasonable amount of fees and expenses, which the Naz Parties describe as "an eminently reasonable interpretation." We are not persuaded. These non-statutory items of cost still were not specially plead, nor did the Naz Parties submit them for resolution before the court rendered judgment. (See *First Nationwide*, *supra*, 77 Cal.App.4th at p. 879.) Accordingly, the $96,233.12 non-statutory fee award was erroneous.

## DISPOSITION

The trial court's order granting judgment notwithstanding the verdict on the quantum meruit claim is reversed; and the trial court is directed to enter judgment on the verdict as rendered by the jury. Further, the amended judgment shall be modified to strike the $96,233.12 awarded in non-statutory costs. We otherwise affirm the judgment. The parties shall bear their own costs on appeal.

_____

Siggins, J.

We concur:

_____

McGuiness, Acting P.J. [*]

_____

Jenkins, J.

*Tierney v. Javaid*, A147221

---

[*] Retired Presiding Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court: City and County of San Francisco Superior Court

Trial Judge: Honorable Suzanne R. Bolanos

Counsel for Plaintiffs and Appellants:

Myron Moskovitz, James A. Ardaiz, Kathy DeSantis, Paul Katz, Moskovitz Appellate Team.

Counsel for Defendants and Respondents:

Mark Poe, Randolph Gaw, Gaw, Poe, LLP.

Lucia MacDonald, Mode Law.